IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Clinton R. Taylor on behalf of Christina Taylor Spriggs (Deceased), | ) ) | C/A No.: 1:11-3222-MGL-SVH |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | REPORT AND RECOMMENDATION |
| Michael J. Astrue, Commissioner, Social Security Administration, | ) ) ) | |
| Defendant. | ) ) | |

This appeal from a partial denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the decedent's claim for Disability Insurance Benefits ("DIB").[1] The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

---

[1] This action is brought by the female decedent's father, but for ease of reference he will be referred to as Plaintiff in the female form.

I.    Relevant Background

A.    Procedural History

On November 13, 2006, Plaintiff filed an application for DIB in which she alleged her disability began on October 15, 2004.  Tr. at 94–96.  Her application was denied initially and upon reconsideration.  Tr. at 52–53, 55.  Plaintiff committed suicide on May 31, 2009.  Tr. at 16.  Thereafter, her father, Clinton R. Taylor, filed the necessary paperwork to be substituted as a party.  *Id.*  On September 30, 2009, Plaintiff had a hearing before an Administrative Law Judge ("ALJ").  Tr. at 37–51 (Hr'g Tr.).  The ALJ issued a partially-favorable decision on February 18, 2010, finding that Plaintiff was not disabled prior to October 19, 2008,[2] but became disabled on that date and continued to be disabled through the date of her death.  Tr. at 16–29.  Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Tr. at 1–3.  Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on November 28, 2011.  [Entry #1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was born in 1963 and completed four or more years of college.  Tr. at 94, 127.  Her past relevant work ("PRW") was as an electronic technician, executive

---

[2] In establishing October 19, 2008 at Plaintiff's disability onset date, the ALJ noted that Plaintiff ceased her illicit drug use on October 18, 2008 and that her symptoms became exacerbated soon thereafter.  Tr. at 26.

recruiter, realtor, and switch technician.  Tr. at 143.  She alleged she was unable to work since October 15, 2004.  Tr. at 94.

On November 27, 2006, Plaintiff completed a work activity report at the request of the agency.  Tr. at 132–40.  She reported that from October 2004 through May 2005 she was on short-term disability from her job as a switch technician for Verizon (also known as Cellco Partnership or "Cellco").  Tr. at 139.  She then attempted to return to work for half days, but began long-term disability after six weeks of work.  *Id.*  She stated she was on long-term disability until October 2005, and had not received any income since then except for stock options that she cashed out of her 401k.  *Id.*  She indicated that she was unable to continue in her job with Cellco because she could not sit for a long time and could not open the heavy doors.  Tr. at 134.  She reported that she then took classes and passed the state examination to obtain her real estate license.  Tr. at 139.  She attempted to work as a real estate agent from January 2006 to August 2006, but stated that she stopped working because she had a hard time going up and down stairs and was in a lot of pain.  Tr. at 134.  In September and October 2006, she reported attempting to work as an executive recruiter, but stated she stopped working because she could not concentrate, was forgetful, and had trouble sitting for long periods of time.  Tr. at 135.

## 2.    Medical History

Plaintiff's medical history reflects longstanding back pain related to an automobile accident in approximately 1984.  Tr. at 350.  In August 2004, Plaintiff saw Steven C. Poletti, M.D., for the first time since 1996.  Tr. at 327.  She complained of excruciating

3

pain in her low back with radiating bilateral leg pain. *Id.* Dr. Poletti diagnosed disc disruption at L5–S1 and recommended lumbar discography to assess the integrity of Plaintiff's lumbar discs. *Id.* The discography revealed that the L5–S1 disc was generating Plaintiff's pain. Tr. at 328. In October 2004, Plaintiff underwent a laminectomy, diskectomy, and fusion. Tr. at 249–58, 333. Dr. Poletti stated that Plaintiff would be unable to work for approximately six months. Tr. at 330–32, 338–39, 342.

In December 2004 and January 2005, Dr. Poletti indicated that he needed to keep Plaintiff on "off-duty status." Tr. at 334–35. In February 2005, Dr. Poletti noted that Plaintiff was better than she was preoperatively, but still had moderately severe pain. Tr. at 336. He recommended physical therapy. *Id.* In March 2005, Plaintiff reported pain her in low back, buttocks, hips, and legs, but Dr. Poletti indicated that Plaintiff was quite functional and improved from her preoperative status. Tr. at 337. He released her to work half days starting on March 28, 2005. Tr. at 342.

Plaintiff attended physical and occupational therapy from March 2005 through July 2005. Tr. at 259–84, 287–313, 407–34. Therapy notes show that she made some improvement, with increased functional endurance, but she was not always compliant with exercising and her "high subjective complaints" of pain limited her progression. Tr. at 269, 271, 275, 281, 433. On March 29, 2005, Plaintiff reported increased hip pain with resumption of work. Tr. at 267.

On May 5, 2005, Plaintiff returned to Dr. Poletti and reported that returning to work had been difficult. Tr. at 344. She stated that she continued to have pain into her

low back, buttocks, hips, and legs, and was taking relatively high doses of Oxycontin and Percocet for breakthrough pain. *Id.* Dr. Poletti recommended that Plaintiff be kept on off-duty status for two months and opined that she could not return to any work involving prolonged sitting, bending, twisting, pushing, pulling, or heavy lifting. Tr. at 344–45.

In July 2005, Plaintiff's physical therapist indicated Plaintiff had "achieved all goals" and had continued to feel better since mobilization. Tr. at 313. Plaintiff was discharged from her physical therapy program. *Id.* Also in July, Plaintiff returned to Dr. Poletti complaining of limited motion in her back and pain with extension. Tr. at 346. Dr. Poletti recommended that she remain out of work and follow up in three months. *Id.*

In August and September 2005, Plaintiff underwent additional physical therapy at Columbia Rehabilitation Clinic, Inc. Tr. at 435–41.

In November 2005, Richard Weymouth, M.D., an agency physician, reviewed the evidence and completed a physical residual functional capacity ("RFC") assessment. Tr. at 314–21. Dr. Weymouth opined that Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; and sit, stand, or walk about six hours in an eight-hour workday. Tr. at 315. He further opined that she could occasionally climb, balance, stoop, kneel, crouch, and crawl. Tr. at 316.

At a follow-up visit with Dr. Poletti on February 1, 2006, x-rays showed solid positioning in grafting. Tr. at 326. Plaintiff complained of low back pain, buttock pain, hip pain, positive straight leg raising, and dysesthesia in both legs. *Id.* Dr. Poletti

5

indicated that Plaintiff's high doses of narcotic analgesics would interfere with her ability to do sedentary work.  *Id.*

On May 3, 2006, Dr. Poletti reported that x-rays showed Plaintiff's fusion mass to be solid, but Plaintiff had some tenderness in and around her hardware and complained of low back, hip, and buttock pain.  Tr. at 325.  Dr. Poletti noted Plaintiff did not have the significant radicular pain that she had before the surgery and recommended that she consider pain management.  *Id.*

In October 2006, Plaintiff established primary care with Michael White, M.D.  Tr. at 350–53.  Dr. White noted that Plaintiff had back pain secondary to a car accident 22 years previously and worked as an executive recruiter.  Tr. at 350.  He indicated that Plaintiff complained of having pain down her legs, but observed normal reflexes and straight leg raising.  Tr. at 352.  An MRI of Plaintiff's lumbar spine showed normal alignment, post-surgical changes, mild degenerative changes, and no significant stenosis. Tr. at 472.

Plaintiff returned to Dr. Poletti on November 9, 2006, complaining of back pain, buttock pain, hip pain, and leg pain.  Tr. at 359.  Dr. Poletti noted that Plaintiff had seen Dr. White, who thought Plaintiff had a problem with narcotic over-usage.  *Id.*  Dr. Poletti indicated that Plaintiff had negative straight leg raising, but noted in the same paragraph that she had positive straight leg raising.  *Id.*  Plaintiff expressed a desire to obtain a second opinion regarding having her rod taken out.  *Id.*  Dr. Poletti opined that rod removal would be "low yield" and stated that if Plaintiff chose to obtain another opinion,

he would leave it up to the pain management physicians to manage her narcotic prescriptions.  *Id.*

In January 2007, Dale Van Slooten, an agency physician, reviewed the evidence and completed a physical RFC assessment.  Tr. at 360–67.  Dr. Van Slooten opined that Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; and sit, stand, or walk about six hours in an eight-hour workday.  Tr. at 361.  He further opined that Plaintiff could frequently balance, kneel, and crawl and could occasionally climb, stoop, and crouch.  Tr. at 362.  He found that she should avoid concentrated exposure to hazards such as machinery and heights.  Tr. at 364.

In March 2007, Ron Thompson, Ph.D., performed a consultative psychological evaluation of Plaintiff.  Tr. at 395–97.  Plaintiff reported that she was independent in her activities of daily living and that her hobbies included "tumbling rocks" and riding on the back of her fiancé's motorcycle.  Tr. at 396.  Dr. Thompson indicated that Plaintiff appeared to be somewhat obsessive and a "worrier," but did not appear to be experiencing any acute psychiatric distress.  Tr. at 395–96.  He diagnosed Plaintiff with an adjustment disorder and dysthymia (depression) secondary to her general medical condition.  Tr. at 397.  Dr. Thompson opined that Plaintiff "could participate in many types of simple repetitive tasks with pace and persistence," but would have some difficulty multitasking and performing complex tasks because of anxiety.  *Id.*  He observed normal ambulation, intact insight and judgment, goal-directed thought process, and psychomotor activity within normal limits.  Tr. at 395.

In April 2007, Larry D. Clanton, Ph.D., an agency psychologist, completed a Psychiatric Review Technique ("PRT") and concluded that Plaintiff had a non-specified adjustment disorder, dysthymic disorder, and anxiety.  Tr. at 368–81.  He found that Plaintiff had moderate difficulties in maintaining concentration, persistence, and pace. Tr. at 378.  Dr. Clanton also completed a mental RFC assessment.  Tr. at 382–85.  He determined that Plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instruction.  Tr. at 382.

From March through May 2007, Plaintiff received pain management treatment from William Odom, M.D.  Tr. at 388–89, 392–93.  On March 15, 2007, Dr. Odom indicated that Plaintiff had been in pain management since at least 1998 and had been unable to work for the past five years "due to the severe 10/10 pain that is present on a 24/7 basis."  Tr. at 389.  Dr. Odom noted that Plaintiff had symptoms consistent with fibromyalgia, but did not make that diagnosis.  Tr. at 388–89.  He adjusted Plaintiff's medication and administered several pain injections and noted marked pain relief.  Tr. at 388.

In July 2007, Michael P. Kilburn, M.D., performed a consultative physical examination of Plaintiff.  Tr. at 473–79, 483–85.  Dr. Kilburn noted that diagnostic imaging revealed no evidence of neural impingement, reported normal findings on physical and neurological examination, and recommended continued pain management with no further surgical intervention.  Tr. at 477–79.

8

In July 2007, Steven Fass, M.D., reviewed the evidence and assessed Plaintiff's physical RFC. Tr. at 399–406. Dr. Fass opined that Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; and sit, stand, or walk about six hours in an eight-hour workday. Tr. at 400. He found that Plaintiff could never climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; and could frequently balance. Tr. at 401. He also found that Plaintiff should avoid even moderate exposure to hazards such as machinery and heights. Tr. at 403.

In March 2008 and continuing through May 2009, Plaintiff sought primary care and pain management from John M. Motto, M.D. Tr. at 498–529. Plaintiff reported being in a car accident in June 2008 and stated that it had "aggravated everything." Tr. at 508. Dr. Motto reported that Plaintiff used marijuana for symptom relief until October 18, 2008. Tr. at 498, 504. Dr. Motto noted Plaintiff's complaints of ongoing back pain and prescribed various medications including Percocet and Oxycontin. Tr. at 498–529.

Plaintiff also received treatment through May 2009 from various providers at Newberry Family Health Center and Little Mountain Family Health Center ("LMFHC"). Tr. at 444–71. Plaintiff complained of panic attacks and was diagnosed with longstanding, generalized anxiety and chronic pain. Tr. at 445, 453–55, 458.

Plaintiff began mental health treatment in November 2008, when she presented to Scott Psychiatric Clinic. Tr. at 494–97. She was assessed with recurrent major depressive disorder; an anxiety disorder, not otherwise specified; a panic disorder with

agoraphobia; a Global Assessment of Functioning (GAF) score of 58; and physical pain and impairments (bulging disks in neck, menstrual migraines, post lumbar fusion, and controlled diabetes mellitus). Tr. at 497.

In May 2009, Plaintiff presented to LMFHC complaining of swelling in her lower legs that she had not previously experienced. Tr. at 447. She reported getting a new tattoo on her left lower leg three weeks prior. *Id.* She exhibited mild edema in her lower legs, a normal gait, grossly normal tone and muscle strength, and a full, painless range of motion of all major muscle groups. Tr. at 448. Examination revealed normal gait, normal overall tone, the ability to easily move on and off of the exam table, and well-preserved flexion with little discomfort. Tr. at 445. Plaintiff was positive for straight leg raising on her left side and exhibited a flat affect. *Id.*

On May 28, 2009, Plaintiff presented to Dr. Motto complaining of pain in her neck, upper and lower back, right shoulder/hip, and anterior chest wall. Tr. at 528. Dr. Motto noted that his plan was to taper and discontinue opioids and discharge Plaintiff from the practice for long-term opioid therapy violation. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

Vocational Expert ("VE") Rebecca Bruce reviewed the record and testified at the September 30, 2009 hearing. Tr. at 43–47. The VE categorized Plaintiff's PRW as an electronics technician as medium, skilled work; as a switch technician as sedentary, skilled work; as an executive recruiter as sedentary, semi-skilled work; and as a realtor as

10

light, semi-skilled work. Tr. at 44–45. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform only simple, routine, and repetitive tasks; could lift or carry over 20 pounds occasionally and 10 pounds frequently; could only occasionally stoop, crouch, kneel, climb stairs or ramps, crawl, or balance; and could never climb ladders, ropes, or scaffolds. Tr. at 45. The VE testified that the hypothetical individual could not perform Plaintiff's PRW. *Id.* The ALJ asked whether there were any other jobs in the region or national economy that the hypothetical person could perform. *Id.* The VE identified the following light, unskilled jobs: rental clerk for storage (DOT 295.367-026) (1,365 jobs in South Carolina; 57,972 jobs nationally); mail clerk (DOT 209.587-026) (1,076 jobs in South Carolina; 102,906 jobs nationally); and ticket puller (DOT 221.687-014) (1,168 jobs in South Carolina; 317,647 jobs nationally). Tr. at 45–46.

The ALJ then presented a second hypothetical individual of Plaintiff's vocational profile who could perform only simple, routine, and repetitive tasks; could lift or carry over 10 pounds occasionally and less than 10 pounds frequently; could not stand or walk over two hours in an eight-hour workday; could only occasionally stoop, balance, crouch, kneel, or climb stairs or ramps; could never crawl or climb ladders, ropes, or scaffolds; and could not be exposed to hazards such as unprotected heights, vibration, and dangerous machinery. Tr. at 46. The ALJ asked whether there were any jobs that would accommodate those restrictions. *Id.* The VE identified the following sedentary, unskilled jobs: order clerk (DOT 209.567-014) (2,672 jobs in South Carolina; 172,760

11

jobs nationally); cashier II (DOT 211.462-010) (4,860 jobs in South Carolina; 685,492 jobs nationally); and charge account clerk (DOT 206.367-014) (1,380 jobs in South Carolina; 102,606 jobs nationally). *Id.*

Upon questioning by Plaintiff's representative, the VE testified that the hypothetical person would not be able to maintain employment if she also had frequent panic attacks requiring her to leave her workstation, chronic pain requiring her to leave her workstation or be absent from work, or fainting spells affecting her ability to do her job. Tr. at 47.

### 2.    The ALJ's Findings

In his February 18, 2010 decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant met the insured status requirements of the Social Security Act through December 31, 2012.
2. The claimant had engaged in substantial gainful activity since the alleged onset date of October 15, 2004 (20 CFR 404.1571 *et seq.*).
3. Since the alleged onset date of disability, October 15, 2004, the claimant had the following severe impairment: degenerative disc disease of the lumbar spine, status post lumbar fusion; adjustment disorder with generalized anxiety, secondary to her general medical condition; and dysthymia secondary to her general medical condition (20 CFR 404.1520(c)).
4. Since the alleged onset date of disability, October 15, 2004, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).
5. After careful consideration of the entire record, I find that prior to October 19, 2008, the date the claimant became disabled, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that work must have consisted of simple, routine, repetitive tasks. Moreover, that work must have required no lifting or

carrying over ten pounds occasionally and less than ten pounds frequently; no standing and/or walking over two hours in an eight-hour workday; only occasional stooping, balancing, crouching, kneeling, and climbing of stairs or ramps; and no crawling or climbing of ropes, ladders, or scaffolds. Furthermore, that work must have allowed the claimant to avoid exposure to hazards such as unprotected heights, vibration, and dangerous machinery.

6.      After careful consideration of the entire record, I find that, beginning on October 19, 2008, the claimant's residual functional capacity was markedly limited and precluded sustained performance of even the minimal requirements of unskilled, sedentary work as defined in 20 CFR 404.1567(b) and 416.967(b).

7.      Since October 15, 2004 [sic], the claimant has been unable to perform any past relevant work (20 CFR 404.1565).

8.      Prior to the established disability onset date, the claimant was a younger individual age 45–49.  The claimant's age category has not changed since the established disability onset date (20 CFR 404.1563).

9.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10.     Prior to October 19, 2008, transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Beginning on October 19, 2008, the claimant has not been able to transfer job skills to other occupations (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11.     Prior to October 19, 2008, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

12.     Beginning on October 19, 2008, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

13.     The claimant was not disabled prior to October 19, 2008 (20 CFR 404.1520(g)), but became disabled on that date and has continued to be disabled through the date of her death on May 31, 2009 (20 CFR 404.1520(g)).

14.     The claimant's substance use disorder is not a contributing factor material to the determination of disability (20 CFR 404.1535).

13

Tr. at 19–29.

II.     Discussion

Plaintiff alleges the Commissioner erred in finding that she performed substantial gainful activity ("SGA") after her alleged disability onset date.   The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is engaged in SGA; (2) whether she has a severe impairment; (3) whether that impairment meets or

equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents her from doing SGA. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step.).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

15

62 (1982).  The claimant bears the burden of establishing her inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy.  To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW.  *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002).  If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work.  *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party."  42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case.  *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence."  *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence.  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational.  *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision."  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

Plaintiff argues that the ALJ improperly concluded that she had engaged in SGA in 2004, 2005, 2006, and 2008 and that this conclusion colored the remainder of the ALJ's analysis.  [Entry #19 at 8].  As a corollary to this argument, Plaintiff argues the ALJ failed to accord proper weight to the opinions of Plaintiff's treating physician, Dr. Poletti.  *Id.* at 7.  The Commissioner contends the ALJ reasonably concluded that Plaintiff performed SGA after her alleged onset date.  [Entry #21 at 10].  The Commissioner further contends that the ALJ did not rely solely on Plaintiff's SGA to find

her not disabled and instead based his determination on the full sequential evaluation analysis. *Id.*

SGA is defined as "work activity that involves doing significant physical or mental activities," including work "done on a part-time basis." 20 C.F.R. § 404.1574(a); *see also Garrett v. Sullivan,* 905 F.2d 778, 779–81 (4th Cir. 1990). In determining whether work constitutes SGA, the ALJ's "primary consideration will be the earnings derived . . . from the work activity." 20 C.F.R. §§ 404.1574(a)(1) and 415.1574(b)(2). Thus, "a determination that plaintiff engaged in substantial gainful activity may be made solely on the basis of earnings compared with the standards set forth in [the] regulation." *Fowler v. Bowen*, 876 F.2d 1451, 1453 n.3 (10th Cir. 1989); *see also* Titles II and XVI: Determining Whether Work is Substantial Gainful Activity–Employees, SSR 83–33, 1983–1991 Soc. Sec. Rep. Serv. 94, 1983 WL 31255 (1983) ("Originally, the determination as to whether a person engaged in [substantial gainful activity] was based on criteria as to the energies, responsibilities, skills, hours, earnings, regularity and related factors pertaining to the work performed. Later it was found that this method was not satisfactory . . . . It was decided that earnings provided an objective and feasible measurement of work. Therefore, an earnings test was established and it has been the primary [substantial gainful activity] guide since 1958.").

Plaintiff's allegation of error centers on an earnings report in the record documenting income of $71,440.85 in 2004; $52,015.85 in 2005; $27,114.91 in 2006; and $5,269.34 in 2008. Tr. at 102. The ALJ recognized that the earnings report

18

conflicted with Plaintiff's work history report.  Tr. at 19.  In the work history report, Plaintiff indicated that she was on short-term and long-term disability with Cellco between October 2004 and October 2005 with an unsuccessful attempt to return to work part-time in May 2005.  Tr. at 139.  She noted that she received monthly disability payments; however, the amount of those payments is not completely legible.  Tr. at 138. The ALJ read the amount as $9,100, but it could also be read as $3,100.  Tr. at 19, 138. Plaintiff also stated in her work history report that she had not had any income since then except for stock options that she cashed out of her 401k.  *Id.*  Plaintiff attempted to work for commission as a real estate agent and an executive recruiter during her alleged period of disability, but stated that she was unable to do those jobs.  Tr. at 134–35.

At the hearing, the ALJ raised the issue of the conflicting earnings report and work history report saying, "I got to figure out where that other money came from."  Tr. at 40. He also stated that the approximately $27,000 in earnings for 2006 could be a 401k cash-out, "but I need something else that shows that other than just her scribbled statement. And I need to know what that $5,269 is in 2008."  Tr. at 41.  At the conclusion of the hearing, Plaintiff's counsel stated that he would seek verification of the disputed earnings.  Tr. at 49.  Plaintiff died prior to the hearing; therefore, the ALJ did not have the opportunity to hear from her.

On October 7, 2009, Plaintiff's counsel sent a letter to the ALJ asking him to send a subpoena to Cellco to ascertain an explanation of Plaintiff's wages.  Tr. at 221. Plaintiff's counsel noted that Cellco had advised him that it may only be able to provide

records from the last year. *Id.* Pursuant to his authority under 20 C.F.R. § 404.950(d)(1), the ALJ sent a subpoena duces tecum to Cellco requiring the company to provide all of Plaintiff's payroll records by November 9, 2009. Tr. at 114. The subpoena provided that if Cellco failed to produce such records, it would be required to show good cause why the evidence had not been submitted at a hearing on November 30, 2009. *Id.* It does not appear from the record that Cellco ever responded to the subpoena. There is no record evidence that either Plaintiff's counsel or the ALJ followed up on the subpoena or that the good cause hearing was held on November 30, 2009.

The ALJ subsequently issued a partially-favorable decision in Plaintiff's case. At step one of the sequential evaluation process, the ALJ stated the following in concluding Plaintiff had engaged in SGA:

> These [earnings] records, on their face, appear disharmonious with the claimant's statements regarding her private insurance payments. Also, there are no records of any income from her work as a realtor or a recruiter. Additionally, confusingly, another income query shows that the claimant received income as recently as the 1st quarter of 2009, although there is some indication that that was possibly later reported earnings duplicative of the earnings otherwise reported in 2008 (Exhibit 4D).

> Therefore, it can be concluded, with a notable degree of hesitation and without the benefit of any further evidentiary explanation, that the claimant, in a light most favorable, was receiving private insurance payments in 2004 and 2005; however, thereafter, she worked at substantial gainful activity levels throughout 2006, and she most likely returned to work at substantial gainful activity levels again for some period of time in 2008. Thus, the claimant has engaged in substantial gainful activity since the alleged onset date.

Tr. at 19.

An ALJ has an independent duty to fully and fairly develop the record so that he may make an informed decision about a claimant's eligibility for benefits.  *See Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986).  Although the claimant bears the burden of proving that she is disabled, the ALJ may not rely only on the evidence submitted by the claimant when the claimant's evidence is inadequate.  *Id.* at 1173.  An ALJ's "failure to ask further questions and to demand the production of further evidence, as permitted by 20 C.F.R. § 404.944" may amount to neglect of the ALJ's duty to develop the evidence.  *Id.* at 1173–74.

Here, the ALJ's issuance of a subpoena to Cellco evinces the importance of resolving the conflict between the earnings report and the work history report.  Nevertheless, he appears to have made his SGA determination without the benefit of additional information from Cellco.[5]  His apparent failure to follow through on collecting the information from Cellco amounts to neglect of his duty to develop the evidence.  *See Dicus v. Sullivan*, No. C-89-658, 1990 WL 264706, at *8 (E.D. Wash. Feb. 19, 1990) (finding that ALJ should have obtained additional information from neutral sources to make an informed SGA determination and remanding to fully develop the record for a finding on SGA).  Consequently, the undersigned recommends remanding this matter to

---

[5] The record reveals the ALJ's concern about the age of this case and his desire to issue an opinion promptly.  *See* Tr. at 42 ("This is one of the oldest cases I've got, and I'm not at all happy about having one that's this old.  It makes me look bad and it's not my fault."); Tr. at 48 ("You have painted yourself into a corner in this one, and you've got a very short period of time to get out of it because I cannot keep this thing open indefinitely and I will not.  It would be unreasonable to ask me to do so."); *see also* Tr. at 49–50.

the ALJ for development of the record on whether Plaintiff engaged in SGA since the alleged onset date.  *See Killian v. Callahan*, No. 96-4226, 1998 WL 159915, at *7 (D. Kan. March 16, 1998) (remanding case where ALJ relied on disputed earnings report to conclude claimant had engaged in SGA).

In what is essentially a harmless error argument, the Commissioner contends that the ALJ's ultimate finding of non-disability prior to October 19, 2008 is supported by substantial evidence because he proceeded through the entire sequential evaluation process rather than relying solely on the SGA determination.  [Entry #21 at 10].  The Commissioner argues that Plaintiff's work activity after her alleged onset date was merely one of many factors the ALJ considered in assessing Plaintiff's credibility and finding that her allegations of disability since October 2004 were not fully credible.  *Id.* The undersigned is not persuaded by this argument and agrees with Plaintiff that the ALJ's ultimate finding was heavily impacted by the SGA determination.  In discounting Plaintiff's credibility, the ALJ stated:

> First, the claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.  The greatest indication here is the claimant's continued work in 2006 and 2008; her ability to continue to work shows that her symptoms and limitations were not as severe as she alleged . . . .

Tr. at 25.  Although the ALJ provided additional reasons for discounting Plaintiff's credibility, his opinion reflects the significance he placed on Plaintiff's ability to work.  Furthermore, in discounting Dr. Poletti's opinions regarding Plaintiff's limitations, the

ALJ concluded the doctor's opinions were not supported by the overall record and stated as follows:

> First, the statements submitted by the claimant show that she retained the capacity to engage in a varied spectrum of activities of daily living (Exhibit 7E). Moreover, the claimant's earnings records show that she continued to work at various times between the alleged onset date and the established onset date (Exhibits 2D, 3D, 4D, 6E, and 12E). Therefore, his above-outlined limitations must be accorded little weight.

Tr. at 25–26. Again, the ALJ's opinion reflects the significance he placed on Plaintiff's ability to work throughout the sequential evaluation analysis. For these reasons, the undersigned does not recommend finding that the ALJ's failure to develop the record regarding Plaintiff's post-onset earnings was harmless error. *See Killian*, 1998 WL 159915, at *7 (finding that ALJ's faulty SGA determination impacted the ALJ's consideration of plaintiff's credibility).

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

Shiva V. Hodges

November 30, 2012                    Shiva V. Hodges
Columbia, South Carolina             United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).